Filed 6/12/26  In re Zi.J. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Zi.J. et al, Persons Coming Under the Juvenile Court Law. | B348340 (Los Angeles County Super. Ct. No. 23LJJP00383A-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. A.C., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Debra L. Gonzalez, Juvenile Court Referee. Affirmed in part, vacated in part and remanded with directions.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

_____

Defendant and appellant A.C. (mother) appeals the juvenile court's order terminating her reunification services with her four children, challenging the findings that (1) the Los Angeles County Department of Children and Family Services (DCFS) provided reasonable services and (2) it would be detrimental to return the children to mother's custody.  Mother also argues that DCFS failed to conduct an adequate further inquiry pursuant to the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) and related California statutes (Welf. & Inst. Code, § 224 et seq.) (collectively, ICWA).[1]  DCFS concedes ICWA error but contests mother's other claims.

We vacate the juvenile court's ICWA finding and remand with directions.  In all other respects, we affirm the juvenile court's order.

## BACKGROUND

### I.    The Family

Mother shares four children with Willie J. (father):  Zi.J. (born Dec. 2012), Zy.J. (born Jan. 2016), Zak.J. (born Aug. 2017), and Zam.J. (born Jan. 2020).[2]  Father moved out of state in or around November 2020, leaving the children with mother.  By

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]    Father is not part of this appeal.

November 2023, the children were living with their grandparents.

## II.     Removal and Jurisdiction

In November 2023, DCFS investigated the family after receiving a report that mother appeared heavily intoxicated at a pediatrician appointment.  The juvenile court subsequently removed the children from both parents.  DCFS placed the children with their maternal grandmother.

In February 2024, the juvenile court sustained an amended section 300 petition and took jurisdiction over the children.  As to mother, the court found that she "has a history of substance abuse and recently tested positive for cocaine, marijuana, and fentanyl," which impacted her ability to care for the children; on one occasion, while mother was under the influence, Zy.J. "lit multiple items around the home on fire and burned" Zak.J. (§ 300, subd. (b)(1); count b-1).  The court also found that mother "did not ensure [Zi.J.] . . . receive[d] consistent mental health treatment" despite his "history of mental and emotional problems[,]" ongoing "auditory hallucinations[,]" and recent involuntary hospitalization. (§ 300, subd. (b)(1); count b-5).

The juvenile court ordered mother to submit to random drug tests; participate in a 12-step program with a sponsor; and complete a parenting program and individual counseling.  The court also ordered mother to sign release of information forms (ROIs) so that DCFS could obtain drug test results and copies of mother's current prescriptions.  Mother was granted monitored visits with the children a minimum of three times per week.  The juvenile court ordered DCFS to provide mother with transportation assistance.

## III.   Six-Month Status Review Hearing

A.    *Mother's Progress*

1.    Drug testing and 12-step program

Between February 22 and August 12, 2024, mother missed 13 out of 19 scheduled drug tests.  The remaining six tests were positive for oxycodone and oxymorphone.

Although mother had provided an oxycodone prescription in March 2024, the amount for which she tested positive was inconsistent; for example, her April 3, 2024 test was 19 times higher for oxycodone than the previous week's test.  When asked about the change, mother claimed that her prescription had increased.  She refused to sign ROIs for her medical providers and did not comply with requests for proof of an updated prescription.

Mother provided no verification of enrollment in a 12-step program.

2.    Parenting program and individual counseling

Mother completed a substance abuse treatment program in January 2024, prior to receiving her case plan.  Although the program included some individual counseling and parenting groups, mother could not articulate any insights she learned from those services.

DCFS reported that mother was "not . . . easy to engage and [wa]s inconsistent[ly] . . . responsive[]" to social workers' attempts to monitor her progress.

3.    Visitation

Mother's visits were sporadic.  She completed just 10 visits over two months, and arrived late to some visits.

4.    Transportation assistance

In March and April 2024, mother's social worker offered her bus passes.  Mother declined both times and instead

4

requested mileage reimbursement. DCFS could not obtain funding for reimbursement before the six-month review hearing.

B. *Hearing*

In August 2024, the juvenile court held a six-month review hearing. (§ 366.21, subd. (e).) The court found that although DCFS had made reasonable efforts to provide services, mother had not made substantial progress.

## IV. 12-Month Status Review Hearing

A. *Mother's Progress*

On September 3, 2024, mother's social worker provided her with a copy of "her most recent minute order and additional case plan documents[.]" Two weeks later, the social worker "email[ed] written instructions of outstanding services left for her case plan." The instructions included the addresses of three drug testing sites, and an offer to provide additional locations if needed.

On September 25, 2024, mother's social worker reviewed the information with her by phone; "requested sponsor information[] [and her] medical provider's information[;]" and "reminded mother of [ROIs] needing to be signed for her providers."

On October 16, 2024, mother's social worker "met with [her] in person and went over outstanding case plan services and documents[.] Mother reported she understood."

1. <u>Drug testing and 12-step program</u>

Between September 6, 2024 and January 28, 2025, mother was scheduled for 22 drug tests. She missed all of them.

A counselor at mother's substance abuse treatment program verbally reported that she had three negative drug tests

5

in January of 2024.  The counselor did not respond to requests for copies of the tests.

Mother filed an ROI with her substance abuse program after repeated requests.  However, she did not file an ROI with her medication management team, rendering DCFS unable to verify her prescriptions.  In October 2024, mother's social worker conference called mother and her medication provider; both the social worker and provider explained that mother would have to sign and file an ROI for DCFS to receive information.  Mother agreed to do so "by the end of the month[,]" but never followed through.

### 2. Parenting program and individual counseling

In August 2024, mother's social worker "assisted [her] in enrolling into [a] parenting [class] . . . coupled . . . with individual counseling."  Between August and October of 2024, Mother attended six out of seven individual counseling sessions and three out of nine scheduled parenting classes.  Mother was "discharged" from the program in October 2024.

Mother remained inconsistently responsive to DCFS inquiries.  When mother did speak to social workers, she demonstrated a "lack[] [of] insight," "dismiss[ing] case issues if they are not of benefit to her" and "express[ing] [that] her children should not have been removed from her and that since she does not have them in her custody she is limited in her living quality because the children were her main source of income[.]"  Mother was unable "to discuss and express understanding of why her case was opened and how to prevent the same or similar incident[s] from happening in the future."

### 3. Visitation and transportation assistance

6

Mother consistently visited the children in June and July of 2024, and the visits went well. She also regularly visited from September through December.

On October 2, 2024, mother's request for mileage reimbursement was rejected. Two weeks later, mother's social worker was able to obtain and transmit to mother an emergency transportation check in the amount of $196.

At the end of February 2025, mother was injured in a car accident; thereafter, she did not have a vehicle. She was only able to visit the children nine times in January and February. Mother again denied an offer of bus passes.

B.  *Hearing*

In February 2025, the juvenile court held a 12-month review hearing. (§ 366.21, subd. (f).) The court again found that DCFS made reasonable efforts to provide services, but mother remained substantially out of compliance with her case plan.

## V.    18-Month Permanency Review Hearing and Termination of Reunification Services

A.  *Mother's Progress*

1.    <u>Drug testing</u>

Mother was scheduled for 12 drug tests between February and April of 2025; again, she missed all of them.

Mother's substance abuse treatment provider never responded to DCFS requests for copies of drug tests. Mother still had not filed an ROI with her medication provider. Nor had she provided proof of participation in a 12-step program, even though her social worker gave her relevant resources.

2.    <u>Parenting program and individual counseling</u>

In April 2025, mother reenrolled in her counseling and parenting program. Her service provider notified DCFS that,

following mother's long absence, she would need to restart the program, requiring mother to complete 16 counseling sessions. Mother was "very upset and reported she would not complete 16 sessions." She only attended four sessions after restarting the program. However, after her last counseling session, the provider concluded that mother "ha[d] achieved her goals and objectives related to case issues and services have concluded."

Mother began a new parenting program on May 7, 2025. She completed eight of the required 12 parenting classes.

Mother's social worker attempted to contact her at least once every two weeks. Mother inconsistently responded to these outreach efforts and often failed to arrive for scheduled visits, impeding DCFS's ability to evaluate her progress.

### 3. Visitation

Mother visited the children 11 times in March and April 2025.

### 4. Transportation assistance

When mother said she was unable to travel to drug test after her January 2025 car accident, her social worker offered to personally pick up mother and take her to tests. Mother did not accept this offer.

In May 2025, mother's social worker renewed her request for mileage reimbursement, even though mother no longer had a car.

### B. *Hearing*

In June 2024, the case reconvened for a contested permanency review hearing. (§ 366.22.) After receiving evidence and hearing argument, the juvenile court found that although DCFS "provided or offered reasonable services to aid the parents in overcoming the problems that led to the" children's

dependency, mother was still "not in substantial compliance" with her case plan and "ha[d] not demonstrated that she has addressed her drug abuse issues." Among other things, the court noted that mother had not submitted to a drug test for more than one year; had never participated in a 12-step program; and failed to comply with court orders to sign ROIs. Accordingly, the juvenile court terminated mother's reunification services.

## VI. Appeal

Mother timely appealed.

## DISCUSSION

## I. Substantial Evidence Supports the Juvenile Court's Findings Regarding Termination of Reunification Services

### A. *Reasonable Services*

Generally, after removing children from a parent, the juvenile court must order DCFS to provide reunification services. (§ 361.5, subd. (a); see also § 362, subd. (d).) To effectuate this mandate, the court sets forth the services that must be provided in a case plan. The court thereafter holds periodic review hearings to assess compliance with the case plan. (§§ 366, subd. (a)(1)(B), 366.21, subds. (e)(8) [six-month hearing] & (f)(1) [12-month hearing], 366.22, subd. (a)(3) [18-month hearing].)

At each review hearing, the juvenile court must assess whether, by clear and convincing evidence, DCFS has made "reasonable" efforts to implement the case plan. (§§ 366.22, subd. (a)(3), 366, subd. (a)(1)(B).) Unless DCFS provides a parent with reasonable reunification services, the court may not initiate a permanency planning hearing. (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 594–597.)

9

An agency provides "reasonable" services when, as relevant here, it "offer[s] services designed to remedy" the problems identified in the parent's case plan and makes "reasonable efforts to assist the parent[ ] in areas where compliance proved difficult." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414, italics omitted.) To be reasonable, DCFS's efforts need not be ideal or perfect (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972), and it need not force a parent to participate in the offered services (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1233).

We review a juvenile court's finding that DCFS has provided reasonable reunification services for substantial evidence, asking whether the record supports such a finding by clear and convincing evidence. (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238–1239 (*T.J.*), disapproved on other grounds by *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 631, fn. 8 (*Michael G.*); *In re V.L.* (2020) 54 Cal.App.5th 147, 149.) In applying this standard of review, we review the record in the light most favorable to the juvenile court's finding. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

Here, the record provides clear and convincing evidence supporting the juvenile court's finding that DCFS made reasonable efforts to provide mother with the services ordered in her case plan. Mother's social worker repeatedly reached out to her to make sure she understood the requirements of her case plan; provided addresses of three drug test sites; offered to find additional locations if needed; attempted to obtain test results from mother's substance abuse treatment program and updated prescriptions from her medication management team; offered to personally transport mother to tests after her car accident; attempted to provide mother with resources on 12-step programs;

10

helped her enroll in a program that offered both parenting classes and individual counseling; arranged a conference call with mother and her medication provider to explain the provider's ROI process; offered mother bus passes multiple times; secured emergency mileage reimbursement; and submitted multiple requests for additional reimbursements, even after mother lost her vehicle.

Mother argues that DCFS did not provide her with "reliable and efficient transportation assistance to attend visits and participate in her case plan." The record—which, as noted above, includes emergency mileage reimbursement, application for further reimbursements, and offers of bus passes and personal rides—belies mother's claim.

Mother contends that DCFS's efforts did not resolve her transportation issues to her satisfaction, but that does not mean that the agency's efforts were unreasonable. "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) Under the circumstances of this case, the services provided were exceedingly reasonable. The cases mother cites in support of her argument are distinguishable. (*T.J.*, *supra*, 21 Cal.App.5th at p. 1229, disapproved on other grounds by *Michael G.*, *supra*, 14 Cal.5th at p. 631, fn. 8 [agency completely failed to provide multiple court-ordered services and unduly delayed in providing others]; *In re A.G.* (2017) 12 Cal.App.5th 994 [no evidence that agency

11

identified or assisted parent with finding appropriate service providers].)

Mother also faults DCFS for failing to provide her with housing assistance. But the juvenile court did not order housing assistance for mother.[3] Mother cites no authority that obligates DCFS to provide services beyond those ordered by the juvenile court. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408 ["To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority . . . that support the claim of error."].) The sole case mother cites is inapposite. (*In re T.W.-1* (2017) 9 Cal.App.5th 339, 346–347 [no reasonable services where agency did not provide housing assistance "despite the juvenile court's direction that such services be included"].)

B.   *Termination of Reunification Services*

When a juvenile court terminates reunification services at the 18-month status review hearing, the court must return the child to the parent's custody unless the court finds, by a preponderance of the evidence, that doing so "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).) We review a finding of detriment for substantial evidence. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400–1401.)

Substantial evidence supports the juvenile court's finding that returning the children to mother's custody would have been detrimental. Mother failed to comply with multiple elements of

---

[3]   To the extent that mother contends her case plan was inadequate for failure to provide housing services, she waived that argument by failing to object to her case plan at disposition. (See, e.g., *In re Precious J.* (1996) 42 Cal.App.4th 1463, 1476; *Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 811–812.)

12

her case plan, including drug testing and filing ROIs with her medication providers.  These failures stymied the efforts of both DCFS and the juvenile court to evaluate mother's progress in resolving the substance abuse issues that led to the children's dependency.  Mother's resistance to participating in services, failure to complete parenting classes, and lack of insight into the safety risks created by her behavior also support a finding of detriment.  (See § 366.26, subd. (a)(1) [in making its detriment finding, the juvenile court "shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which they availed themselves of services provided"].)

Mother argues that she should have been awarded reunification services under section 366.22, subdivision (b)(3). That section provides for reunification services beyond the 18-month mark only if the juvenile court finds, inter alia, that "the parent . . . has made significant and consistent progress in the prior 18 months in resolving problems that led to the child[ren]'s removal from the home."  (§ 366.22, subd. (b)(3)(B).)  As discussed above, the record shows that mother's progress was neither significant nor consistent.  She therefore does not qualify for further reunification services.

## II.    ICWA Error Warrants Remand

"ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family."  (*In re Austin J.* (2020) 47 Cal.App.5th 870, 881, disapproved on other grounds in *In re Dezi C.* (2024) 16 Cal.5th 1112, 1152, fn. 18.)

ICWA and corresponding statutes that our Legislature enacted to implement ICWA assign the juvenile court and DCFS "three distinct duties" aimed at assessing whether a child in a dependency action is an "Indian child," and hence a child who should not be separated from his or her tribal family through adoption or foster care placement. (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052 (*D.S.*).) First, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a) & (b).)

If that initial inquiry creates a reason to believe the child is an Indian child, the agency must make further inquiry regarding the possible Indian status of the child. (§ 224.2, subd. (e).) There is reason to believe a child is an Indian child when there is "information suggesting that either the parent of the child or the child is a member or citizen, or may be eligible for membership or citizenship, in an Indian tribe[.]" (§ 224.2, subd. (e)(1).) Further inquiry includes gathering information from the parents and relatives and contacting the tribes. (§ 224.2, subd. (e)(2).) Contact with the tribe "shall include sharing information identified by the tribe as necessary for the tribe to make a membership or citizenship eligibility determination." (§ 224.2, subd. (e)(2)(C).)

Finally, if that further inquiry results in a reason to know the child is an Indian child, then the formal notice requirements of section 224.3 apply. (*D.S.*, *supra*, 46 Cal.App.5th at p. 1052.)

Here, the children's paternal grandmother told DCFS that the children may have Cherokee ancestry through their paternal lineage. Mother argues—and DCFS concedes—that although this provided a reason to believe that the children may be Indian children, DCFS did not discharge its statutory obligations to

14

contact the potential tribes and share relevant information. (§ 224.2, subd. (e)(2)(C).) We agree.

Mother argues that this error warrants conditional reversal. However, this juvenile dependency case remains ongoing, and DCFS has a continuing duty of inquiry. (§ 224.2, subd. (a).) When an appellate court determines, on appeal from an order prior to termination of parental rights, that the ICWA duty of inquiry has not been satisfied, the appellate court may affirm the court's orders in part, vacate the court's finding that ICWA does not apply, and remand for DCFS to comply with its ICWA obligations. (*In re Dominick D.* (2022) 82 Cal.App.5th 560, 563–564, 567–568; see also *In re T.R.* (2024) 107 Cal.App.5th 206, 220–221.) We therefore decline to implement mother's requested remedy of conditional reversal of all the juvenile court's findings and orders made at the section 366.22 hearing.

## DISPOSITION

The juvenile court's finding that ICWA does not apply is vacated, and the matter is remanded for further proceedings in which DCFS and the court shall perform their continuing duties of inquiry, including by: DCFS notifying all identified potential tribes and relevant state agencies of the children's potential Indian status; DCFS documenting its efforts; the court making a finding regarding ICWA's applicability; and, if needed, proceedings in accordance with sections 224.2, 224.3, and 224.4. In all other respects, the juvenile court's findings and orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

15

_____, J.
GOORVITCH

We concur:


_____, Acting P. J.
RICHARDSON


_____, J.*
GILBERT

---

\* Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.